Ian Furminger, Pro Se
248 Columbia Avenue
Kensington, CA 94708
510-666-5780
Ian1297@yahoo.com
Pro Se Defendant



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>IAN FURMINGER,<br><br>    Defendant. | Case Number: 3:14-CR-00102-CRB<br><br>FIRST AMENDED DECLARATION OF IAN FURMINGER IN SUPPORT OF MOTION UNDER 28 U.S.C. SECTION 2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY |

I, IAN FURMINGER, declare as follows:

1. I am currently under custody of the Bureau of Prison serving out a 41-month sentence which was reduced due to my successful completion of the Residential Drug Abuse Program (RDAP) program. I have a remaining three years of probation.

2. At trial, I was represented by Brian Getz and John Paul Passiglia. I was found not guilty of six of the ten charges alleged in the indictment, but was convicted of four other counts: Count One - Wire Fraud, in violation of 18 U.S.C. Section 13431; Count Two - Wire Fraud, in violation of 18 U.S.C. Section 1343; Count Five - Conspiracy against Civil Rights in violation of 18 U.S.C. Section 241; and Count Six - Conspiracy to Commit Theft Concerning a Federally Funded Program, in violation of 18 U.S.C. Section 371.

3. In my 20 year-career working as a police officer in high-crime neighborhoods, I testified at hundreds of preliminary hearings, motions to suppress evidence or to revoke probation, trial and other evidentiary hearings. Based on my experience, I wanted to testify on my own behalf at trial. My desire to testify put Mr. Getz and myself in direct conflict with one another and led to irreconcilable differences on how to proceed with my case. Every desire to testify on my own behalf was met with his response of: "The Government does not have a case against you."

4. Pretrial meetings with Mr. Getz often involved lunches where he ordered alcohol to drink and offered me drinks knowing I was struggling with a significant alcohol problem. On numerous occasions throughout the trial, I informed Mr. Getz that I wanted to testify in my own defense. Mr. Getz did not want me to testify. My desire to testify put Mr. Getz and myself in direct conflict with one another. Every suggestion to testify on my own behalf was met with his response of: "The Government

does not have a case against you." Mr. Getz treated me more as a "buddy" than as a client facing serious criminal charges. My struggle with alcoholism and Post Traumatic Stress Syndrome (PTSD), was never brought in as a defense to explain oversight or possible neglect of my duties, rather than a deliberate act to play a part in the "scheme" of what transpired.

5. During trial, my attorney ignored my request to testify, and ignored evidence I brought to his attention. He also did not give me advice, or confer with me as events unfolded. Much of the testimony that took place and led to the jury's perception that I was part of a "scheme" could have been explained by my testimony as well as witnesses who were not called on my behalf that could have corroborated my testimony. Mr. Getz assured me that he knew what he was doing and told me that I did not need to testify because I would never be convicted based on the Government's evidence. He also threatened that he would not put on a defense if I testified and that if I testified, it would confuse the jurors as to the theory of his case.

6. Mr. Getz was assisted in the case by attorney John Paul Passaglia. I was never informed that Mr. Passaglia would present any closing arguments to the jury. Mr. Passaglia's closing arguments demonstrated nothing less than his lack of knowledge in my case. Getz as the lead attorney failed to present a clear closing argument based on evidence solely against me in this case.

7. In the midst of a very contentious divorce and child custody battle, Mr. Getz called my estranged wife as a witness at trial to speak to our financial condition in 2008. My financial situation was very important, since I was accused of the same theft that my two subordinates were charged with. Robles' poor financial condition became relevant at trial to explain motive. I felt it was important to show I did not have any financial problems, and therefore would have had no motive to commit crimes for gain while employed as an officer. In 2008, I had an income of $558,000. This was based upon $196,000 in salary and overtime and a $360,000 profit on the last house I remodeled and sold. During her testimony, my then estranged wife, Stephanie, told the jury I made $120,000 in 2008, which was misinformation. When asked how she knew by the prosecutor, she said she looked at my tax return. I wanted to testify and show my tax return from 2008 showing income of $558,000. I had my tax return with me and Getz knew about. I motioned and sent notes to Getz to object as he was aware of my income. Getz did not object. The jury never heard any evidence about the undisputed facts of actual amount of money I earned in 2008.

8. Reynaldo Vargas admitted to the crimes and agreed to testify for the prosecution in exchange for a promise of a lenient sentence. Vargas' partner, Edmond Robles, had a significant amount of incriminating evidence connecting him to the scheme with Vargas. Vargas testified in detail to Robles' involvement, and Robles corroborated Vargas' testimony by his own actions. I owed no money outside of my home mortgage. Mr. Getz advised me not to testify. Had I testified, I could have

explained my financial situation as well as the surrounding evidence regarding my accusations in the crimes of theft, which I was found not guilty of.

9. If I had testified, I could have been able to tell the jury I was not part of the conspiracy and that I had no knowledge of Robles' and Vargas' scheme. In fact, when I ultimately discovered that Vargas had some questionable involvement with informants Bram and Walsh, I ordered him not to work with them. I submitted a memorandum to the San Francisco Police Department, Management Control Division (which was renamed before trial, as the Internal Affairs Department) to open an investigation. In addition, the Police Department never formally interviewed me regarding my memorandum or the relationship of Vargas to Bram and Walsh. The jury never heard any of this evidence, which I would have offered in great detail through my testimony. I would also have testified that I had no knowledge that Vargas was stealing drugs, or that he was giving drugs away to informants to sell to third parties.

10. This was also proven by the fact that I had the informants, Jayme Walsh and Daisy Bram arrested. This included separate arrests on two different days for selling the same marijuana. Walsh and Bram later said this marijuana was furnished to them by Vargas. When I learned that Vargas was working with the informants, Daisy Bram and Jayme Walsh, I turned them in by submitted a written memorandum the next day to start the investigation. I did this in conformance with SFPD procedures. This information was critical to my defense. I

would have testified about all the details at trial. I would have explained the mechanics of this in my testimony.

11. The conspiracy to violate civil rights was derived from the theft Vargas committed at the storage locker. The conspiracy to commit theft from a government funded program because San Francisco Police receives grant money. I could and would have explained all of this if I had not followed my attorney's instructions not to testify.

12. The government argued at trial that I did nothing to stop Vargas and Robles illegal activities. During the sentencing hearing, Judge Breyer also said I did nothing to stop their activity. This is not true. Had I testified, I would have testified that I was included in a late-night phone call Vargas had with informants Bram and Walsh where they threatened to extort or kill Vargas. This was approximately two months after I ordered Vargas and Robles not to work with them. I documented and reported this phone call and the threats to the Internal Affairs Division. Vargas was interviewed by Internal Affairs. Internal Affairs concluded Vargas was lying and ended the investigation. I was never interviewed, even though I was the one who started the investigation. Furthermore, two officers, David Brandt and Sean Dougherty, arrested Bram and Walsh on two separate days. They called me for advice because one of those arrested had my business card. I told the officers to arrest Bram and Walsh. I would have testified that if I had known they had received the marijuana from Vargas, that having

them arrested would make me guilty of the same offense and add me to the conspiracy that I did not know existed.

13. My testimony would have shown that I had no knowledge of the involvement with Vargas, Bram, and Walsh, other than when I ordered Vargas and Robles not to work with them anymore. In addition, Vargas and Robles wen to visit Bram and Walsh after the Golden Gate Park arrest by Officers Dougherty and Brandt. I was never aware that a meeting between Bram and Walsh (the informants) and Robles and Vargas took place, which would have proved that Vargas and Robles were involved in the scheme together without my knowledge.

14. At trial, Officer Vargas testified that he gave me money that he took from a storage locker search on 19th Avenue. This did not happen. Evidence was presented at trial that I responded to that arrest while off duty. The government argued that I came in off-duty to further the "scheme". When I found out it was not a substantial arrest requiring my presence, I left the storage locker at 19th Avenue. I would have testified that I was unaware of any scheme. I worked different days and shifts so that we had full coverage on all days, and I split my shifts to supervise and oversee operations. Had I testified, I would have contradicted Vargas' testimony that I changed my shift to work with him and Robles. I would have testified that I changed my shift to work with others on my team and that I was not aware of any "scheme".

15. Part of my duties as a sergeant was to review reports for accuracy and to ensure that all the relevant crime elements

were reflected in the report. I would have testified that I regularly signed and faxed reports, including many of arrests or investigations I did not participate in or attend. It is the practice of the SFPD that sergeants not necessarily attend all arrests or search warrants for which they sign off on.

16. Captain Tacchini was willing to testify that I came in off duty under his direction for significant arrests. Captain Tacchini was never called to testify. The jury did not get to hear testimony from Captain Tacchini that responding to my team and being present for significant arrest while off-duty was a necessary party of my job. The jury, with no further information presented to them, found me guilty of wire fraud for responding to Vargas' test to come to the storage locker.

17. Officer Reynaldo Vargas had a history of corruption and dishonesty in the department. Officer Candette Hilder was the officer who discovered Vargas had submitted thousands of dollars in fraudulent overtime cards. I asked Mr. Getz to call Officer Hilder as a witness to show Vargas' prior history of dishonesty and corruption. Officer Hilder was never called to testify and the jury never heard this evidence because of Vargas' guilty plea.

18. Vargas testified that he stole $30,000 while executing a search warrant in Newark, California on 5/29/2009. He further testified he gave me $10,000 and that I purchased skylights for my home with that money. Had I testified, I would have explained prior to the alleged theft taking place in Newark, I purchased the skylights for my home from Eric Ryner at Bay Area

Windows in Lafayette, California on 5/6/2009 (prior to the alleged theft) and installed them with my helper, Ignacio Ramirez. Had I testified, both Eric Ryner and Ignacio Ramirez could have been called to corroborate my testimony as to the time in which the skylights were bought and installed. (See Exhibit A - Declaration from Eric Ryner and Invoice for purchase of skylights on 5/6/2009). The jury never heard this evidence.

19. Vargas testified to a theft at the Sunrise Hotel where Robles stole money. He said Robles split the money he found with us. That did not happen. I would have testified to that. In the same testimony, Vargas testified that it was not Furminger but Sergeant Bueno who signed the police report. Mr. Getz knew about this report. We knew it was signed by Sergeant Bueno, but nothing was said to the jury to clarify whose signature was on the report. This was my conviction for Count 2 Wire Fraud and prejudiced me to the jury on the remaining three convictions.

21. On November 28th, 2009 I was in a serious off duty motorcycle accident. I was off work for three months to recover. I would have testified that when I returned to work, my new captain, Captain Coralles, told me he would add a sergeant to plain clothes to assist me. I had decided to quit plain clothes and go back to uniform patrol. I did this because I had asked for help in the past and was denied. I reported possible corruption involving informants Daisy Bram and Jayme Walsh with Officer Reynaldo Vargas, an investigation that the department

vacated before it even started. I was never interviewed regarding my complaint. I wanted Captain Corrales to corroborate that I quit out of frustration over my ignored efforts to try and improve the team with more supervision. When Captain Corrales took over as commanding officer, he saw the need to do just that. I left Mission Station two months later for Tenderloin on an officer request transfer.

22. On May 17th 2011 I prepared a memorandum to change the policy on property processing of arrested persons. I wanted to testify that I believed that the policy in place did not protect the citizens' property nor did it protect the officers from liability. I wanted to change the property receipt process where the suspect is given an inventory sheet of property while he is on scene. The current policy does not protect the citizen or the officer or prevent officers from helping themselves to the property of others, if that were to happen. This policy change was denied by the San Francisco Command Staff. Since this case involved the stealing of citizens' property, I wanted the jury to see, prior to indictment or investigation, I filed this request to improve the department and protect everyone involved. (Copy of memorandum and denial memorandum attached). I would also testify that I was never interviewed further about my recommendation prior to it being denied.

23. On April 14, 2017, I made an appointment to meet with Mr. Getz to get a declaration from him regarding his failure to properly represent me and not allowing me to testify at trial based upon his belief the government had no case against me. Mr.

Getz said he had just got off a long trial and had little to no recollection of my trial and could not give me a declaration.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on April 20th, 2017.

Signature: _____
IAN FURMINGER

Ian Furminger, Pro Se
Address: 248 Columbia Avenue
Kensington, CA 94708
510-666-5780
Ian1297@yahoo.com

Getz said he had just got off a long trial and had little to no recollection of my trial and could not give me a declaration.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on April 20th, 2017.

Signature: _____
IAN FURMINGER

Ian Furminger, Pro Se
Address: 248 Columbia Avenue
Kensington, CA 94708
510-666-5780
Ian1297@yahoo.com